# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

BANK OF MONTREAL,

        Plaintiff,


v.

                          **MEMORANDUM OF LAW & ORDER**
                          Civil File No. 10-591 (MJD/AJB)

AVALON CAPITAL GROUP, INC.;
JOSEPH BURKE; ROBERT J. MACHACEK;
ANTHONY R. BASSETT; and WILLIAM D.
MURRAY;

                Defendants.

---

Christopher R. Morris and Lewis A. Remele, Jr., Bassford Remele, PA, and
James M. Heiser, James E. Spiotto, and Mark D. Rasmussen, Chapman and
Cutler, LLP, Counsel for Plaintiff Bank of Montreal.

David M. Schiffman, James F. Bendernagel, Jr., Jennifer A. Ratner, and
Meredith Jenkins Laval,  Sidley Austin LLP, and Jason R. Asmus, Richard
D. Anderson, and Richard G. Mark, Briggs & Morgan, PA, Counsel for
Defendant Avalon Capital Group, Inc.

Bradley M. Orschel, David T. Schultz, and Richard G. Wilson, Maslon
Edelman Borman & Brand, LLP, and James M. Miller and Ryan Roman,
Akerman Senterfitt, Counsel for Defendant Joseph Burke.

LuAnn M. Petricka, Petricka Law Firm, PA, and William R. Skolnick,
Skolnick & Shiff, PA, Counsel for Defendant Robert J. Machacek.

Andrew P. Holm, Bret A. Puls, and Christine L. Nessa, Oppenheimer Wolff & Donnelly LLP, Counsel for Defendant Anthony R. Bassett.

Mark T. Berhow, Shushanie E. Kindseth, and Thomas P. Kane, Hinshaw & Culbertson, LLP, Counsel for Defendant William D. Murray.

## I.    INTRODUCTION

This matter is before the Court on five motions to dismiss: Defendant Anthony Bassett's Motion to Dismiss the Amended Complaint [Docket No. 14], Defendant Avalon Capital Group, Inc.'s Motion to Dismiss the Amended Complaint [Docket No. 20]; Defendant Joseph Burke's Motion to Dismiss Amended Complaint [Docket No. 25]; Defendant Robert J. Machacek's Motion to Dismiss the Amended Complaint [Docket No. 33]; and Defendant William D. Murray's Motion to Dismiss Amended Complaint [Docket No. 39].  The Court heard oral argument on September 3, 2010.

## II.    SUMMARY

The Court dismisses all counts asserted against Defendants Burke, Machacek, Bassett and Murray.  Two claims against Defendant Avalon Capital Group, Inc., remain.  Because the Amended Complaint fails to specify the speakers and recipients of the alleged misrepresentations in this case, the Court dismisses Counts I, II, III and IV of the Amended Complaint without prejudice

for failure to plead fraud with particularity. The Court further dismisses Count V with prejudice for failure to state a claim as to the individual Defendants, because there is no allegation that the individual Defendants controlled Lakeland. Finally, the Court dismisses Count VII in its entirety with prejudice for failure to state a claim, because breach of contract is not a tort.

## III. BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiff is Bank of Montreal ("BMO"). BMO is a Canadian chartered bank that operates through its Chicago branch. (Am. Compl. ¶ 16.)

BMO's affiliate, BMO Capital Markets Corp. ("BMOCM") was involved in the facts of this case and "typically serves in an agency capacity for the lender and obtains facts and information which it passes on to the lender and BMO so that the lender and BMO can make their own independent credit decisions." (Am. Compl. ¶ 129.)

BMO claims that it lost approximately $100 million from the $150 million that it loaned to Lakeland Construction Finance, LLC ("Lakeland") and its subsidiary, LCF Funding I, LLC ("LCF Funding"). (Am. Compl. ¶¶ 1-2.)

Lakeland was the sole member of LCF Funding.  (<u>Id.</u> ¶ 19.)  Lakeland is a

Minnesota-based limited liability finance company that extended credit to

developers, contractors, and builders of residential homes and developments in

Minnesota, Wisconsin, and South Carolina.  (<u>Id.</u> ¶¶ 3, 17, 24.)  It was founded in

1999.  (<u>Id.</u> ¶ 24.)  Lakeland is currently in receivership in Minnesota state court.

Defendant Avalon Capital Group, Inc. ("Avalon"), a Delaware

corporation, was Lakeland's majority equity investor, a member of Lakeland,

and Lakeland's sole manager, and it "controlled all aspects of Lakeland in

Minnesota."  (Am. Compl. ¶¶ 3, 19.)  At all relevant times, Avalon maintained

managerial and operational control over Lakeland's affairs.  (<u>Id.</u> ¶¶ 28-30.)  Ted

Waitt founded Avalon and was its primary principal and owner.  (<u>Id.</u> ¶¶ 38, 79,

105.)  Previously, Waitt founded and sold Gateway Computer, making him a

member of the Forbes list of the 400 richest Americans.  (<u>Id.</u> ¶ 105.)

Defendant Anthony R. Bassett serves or previously served as the president

and chief financial officer of Lakeland.  (Am.  Compl. ¶ 22.)  Bassett also serves

or formerly served as the president and manager of LCF Funding.  (<u>Id.</u>)  At all

relevant times, he owned membership units of Lakeland.  (<u>Id.</u>)

Defendant Joseph Burke serves or has served as chief executive officer of Lakeland beginning in 2005. (Am. Compl. ¶¶ 20, 79.) He serves or served as the chief executive officer of LCF Funding and as manager of LCF Funding in Minnesota. (Id. ¶ 20.) At all relevant times, he owned vested options to purchase membership units of Lakeland. (Id.)

Defendant William D. Murray serves or formerly served as Lakeland's chief financial officer. (Am. Compl. ¶ 23.) At all relevant times, he owned vested options to purchase membership units of Lakeland. (Id.)

Defendant Robert J. Machacek was the chief operating officer of Lakeland until late 2007. (Am. Compl. ¶ 21.) He owned membership units of Lakeland at all relevant times. (Id.)

In the Amended Complaint, BMO often refers to the "BMO parties," which it defines as "BMO, BMO Capital Markets Corp. and/or the lender." (Am. Compl. ¶ 1 n.3.)

## 2.    Lakeland's Business Model

The Amended Complaint alleges that in 2002 and 2003, when Avalon acquired Lakeland, it used Machacek, Burke, and out-of-state consultants lacking

experience in Lakeland's markets to aggressively expand Lakeland's portfolio of riskier land development loans.  (Am. Compl. ¶¶ 31-35, 38, 39, 41, 48.)

In the fall of 2005, Defendants realized that the housing market was going to take a downturn.  (Am. Compl. ¶¶ 46-47.)  At that time, Lakeland had $425 million secured revolving credit in place to finance the loans it originated.  (Id. ¶ 42.)  This line of credit was secured by a lien on its assets, which primarily consisted of its loan portfolio.  (Id.)  The credit line allowed Lakeland to borrow a percentage of eligible notes receivable.  (Id.)  In order for loan receivables to be included in Lakeland's collateral base, Lakeland had procedures to ensure that the loan receivables were "eligible," were properly administered, and were based on on-time and on-cost construction projects.  (Id. ¶ 45.)  BMO claims that, at that time, market indicators warned of downturns that should have caused Lakeland to tighten its origination standards.  (Id. ¶ 47.)  However, in order to pursue aggressive growth, Defendants instead caused Lakeland to relax and even ignore its underwriting standards and approve and fund more non-conforming loans close to the cost of the projects, with little or no equity cushion.  (Id. ¶ 49.)  Lakeland used reckless lending standards, quickly approving loans without visiting sites or obtaining independent appraisals.  (Id. ¶ 52.)  Machacek had a

practice of pressuring developers into consolidating loans nearing default – known as "being on the radar" – into new loans with new maturity dates.  (Id. ¶ 58.)

By late 2005, Defendants were aware that the market was contracting and knew or should have known that Lakeland's loans would soon begin to deteriorate.  (Am. Compl. ¶¶ 64-67.)  At this point, Avalon's investment was more than $100 million.  (Id. ¶ 40.)  In order to recoup Avalon's money, Defendants devised a scheme to extract money out of Lakeland. (Id. ¶ 72.)  They knew that no lender would extend credit to Lakeland when its collateral base had a high number of ineligible loan receivables.  (Id.)  Therefore, Defendants formed a plan to allow Lakeland to offload its ineligible loans at 100 cents on the dollar to a new lender.  (Id. ¶¶ 72-77.)  Under the plan, Lakeland would use a securitization financing structure, and it would serve as the servicer of the loans. (Id. ¶¶ 68, 74-75.)  Avalon directed Burke and Machacek to head up the scheme. (Id. ¶ 79.)  The plan would benefit Avalon, Machacek, and Bassett – all Lakeland equity owners – as well as Murray and Burke, who owned vested membership options in Lakeland.  (Id. ¶¶ 125-26, 216.)

### 3.      The Offering Memorandum

In the summer of 2005, Lakeland engaged a third-party agent, Gregory Gac of Quadrant Financial Services, to approach BMO regarding the planned securitization.  (Am. Compl. ¶ 83.)  In September 2005, Lakeland offered "the BMO parties" an Offering Memorandum which stated, among other things, that Lakeland's officers had "extensive experience in construction financing and asset-based lending prior to Lakeland;" that they "routinely visit job sites to inspect projects;" that "no material exceptions have ever been noted" with respect to its audit procedures; and that Lakeland would follow certain procedures for operating the securitization designed by an accounting firm.  (Id. ¶¶ 87- 88.)

The Offering Memorandum also stated, "In early 2001, Mr. Machacek pleaded guilty to two counts of federal mail fraud to settle charges from his activities at a prior employer.  Lakeland will provide a detailed explanation of these events upon request."  (Offering Memorandum at 28.)  Machacek's criminal record was disclosed to BMO before any contractual relationship was formed.  (See also Am. Compl. ¶¶ 104-06.)

### 4.    Machacek's Criminal Record and the Waitt Telephone Call

In response to BMO's concerns regarding Machacek's criminal convictions, Bassett prepared a memorandum for the BMO parties stating that Machacek's convictions were mitigated by certain circumstances.  (Am. Compl. ¶ 104.)

Additionally, because of concerns about Machacek, a representative of one of the BMO parties spoke to Waitt.  (Am. Compl. ¶¶ 105-06.)  Waitt "indicated that Lakeland was one of Avalon's most successful and important investments and, notwithstanding Machacek's prior criminal history, he was extremely supportive of Machacek and very comfortable with his role of heading up Lakeland's loan origination and underwriting operations."  (Id. ¶ 106.)  BMO claims that, but for Waitt's misrepresentations and omissions, the BMO parties would not have entered the transaction.  (Id. ¶ 109.)

Burke similarly strongly vouched for Machacek's character and capabilities, while knowing Machacek was causing Lakeland to originate ineligible and questionable loans.  (Am. Compl. ¶ 108.)

### 5.    The Receivables Financing Agreement ("RFA")

On December 22, 2006, LCF Funding entered into the Amended and Restated Receivables Financing Agreement ("RFA") that is the heart of this case.

(Am. Compl. ¶ 119; RFA.) LCF Funding was formed specifically for the RFA. (Am. Compl. ¶ 117.) Under the RFA, Fairway Finance Co. ("Fairway") provided a $150 million loan (the "RFA Loan") to LCF Funding. (Id. ¶¶ 119, 123.) LCF Funding used the money to purchase certain mortgage loans that Lakeland had extended to home builders and developers under a Purchase Agreement dated December 23, 2005. (Id. ¶¶ 117-18.) Approximately $176 million in loan receivables and accrued interest were sold to LCF Funding. (Id. ¶ 122.) Lakeland acted as "Servicer" for these mortgage loans. (Id. ¶ 120.) Each loan transferred to LCF Funding was required to be "eligible," as defined in the RFA, to comply with certain underwriting standards. (Id. ¶ 121.)

BMO was designated as the "Liquidity Provider" for the "conduit" lender that it procured, Fairway. (Am. Compl. ¶ 127, 137.) BMOCM was installed as the lender's Administrative Agent. (Id. ¶ 1 n.3.) BMO signed a Liquidity Asset Purchase Agreement with Fairway and BMOCM (the "LAPA"). (Id. ¶ 128.) Fairway issues asset-backed commercial paper, the proceeds of which are used to finance securitization transactions in which BMO provides liquidity support. (Id. ¶ 130.)

Under the LAPA, BMO promised to purchase certain loans.  (Am. Compl.

¶ 131.)  On December 23, 2005, concurrently with the execution of the RFA,

Fairway, BMO and BMOCM entered into a Purchase Commitment Agreement

("PCA"), under which BMO assumed a $153 million purchase commitment

under the LAPA.  (Id. ¶ 132.)  BMO was obligated to bear the risks rather than

Fairway.  (Id. ¶ 133.)

Based on the high "level of repurchases and substitutions made by

Lakeland and the large volume of framing date violations" in 2006, the RFA was

amended to relax the requirements for eligible loans.  (Am. Compl. ¶¶ 140, 142.)

LCF Funding defaulted on the RFA Loan and Lakeland breached its

obligations under the RFA.  "As a result of Lakeland's breaches, BMO has

sustained damages of at least $100 million."  (Am. Compl. ¶ 295.)

###     6.    Alleged Fraud

 The Amended Complaint alleges a two-part fraudulent scheme.  (Am.

Compl. ¶ 2.)  First, the BMO parties were fraudulently induced into making the

$150 million RFA Loan in exchange for collateral that could not be used for

repayment.  (Id.)  They were induced by the Offering Memorandum, a

memorandum regarding Machacek's criminal convictions prepared by Bassett,

Burke's vouching for Machacek, and a telephone call with Waitt in support of Machacek. (Id. ¶¶ 84-109.) Second, after the loan was made in December 2005, Defendants engaged in a plan to conceal the ongoing fraud. (Id. ¶ 2.)

BMO asserts that it relied on the fact that the underlying collateral would comply with comprehensive eligibility criteria (Am. Compl. ¶¶ 91, 99-100, 121); would be overseen by individual Defendants with "extensive" and "exceptional" expertise (id. ¶ 88); in low-volatility markets (id. ¶ 94); with a substantial collateral cushion to sustain a "significant market downturn" permitting an 18-month payoff period if Lakeland were to stop originating new loans (id. ¶¶ 97, 166).

After BMO executed the securitization, Defendants, through their control of Lakeland, continued to mask the true nature of the loans that were in the securitization portfolio by shuffling loans into and out of the portfolio to cover up the substantial amount of ineligible loans the BMO parties were induced to finance. (Am. Compl. ¶¶ 155-58.) In particular, under the RFA, a Lakeland officer was required to certify that the eligible receivables component of the borrowing base were correct. (Id. ¶ 148.) These certifications, executed from December 2005 through January 2008, are referred to as the borrowing base

certificates and were primarily signed by Bassett and Murray.  (Id.; Am. Compl.,

Ex. 3.)  BMO claims that these borrowing base certificates were false because

many of the loans were not, in fact, eligible. (Am. Compl. ¶ 149.)

### 7.     The Lakeland Receivership

Based on Lakeland's insolvency, on October 31, 2008, a Hennepin County

court appointed a receiver for Lakeland.  On November 6, 2008, that court stayed

all litigation against Lakeland or its assets.  Because of the stay in Hennepin

County court, BMO cannot currently pursue action against Lakeland.

### B.     Procedural Background

### 1.     The Receiver Action

This Court also presides over the related case of Bartholomew v. Avalon

Capital Group, Inc., Civil File No. 09-1279 (MJD/AJB).  In that case, the Lakeland

Receiver sued Avalon to recover certain money transferred from Lakeland to

Avalon.  On November 30, 2009, the Court entered an Order denying Avalon's

motion to dismiss that complaint.

## 2.    The Current Action

In 2009, BMOCM sued Defendants in the Circuit Court of Cook County,

Illinois.  According to Defendants, that case was dismissed for lack of personal

jurisdiction in November 2009.

On March 2, 2010, BMO filed a Complaint against Avalon, Burke,

Machacek, Bassett, and Murray in this Court.  [Docket No. 1]  On March 18, BMO

filed an Amended Complaint against the same five Defendants.  [Docket No. 7]

The Amended Complaint alleges: Count I: Fraud, Intentional Misrepresentation

and Fraudulent Concealment (Avalon and Lakeland Principals); Count II:

Negligent Misrepresentation (Avalon and Lakeland Principals); Count III:

Aiding and Abetting Misrepresentation and Concealment (Avalon and the

Lakeland Principals); Count IV: Civil Conspiracy (Avalon and Lakeland

Principals); Count V: Sham Transaction/Alter Ego Liability (Avalon, Bassett and

Machacek); Count VI: Unjust Enrichment (Avalon); and Count VII: Conspiracy to

Breach Contract (Avalon and Lakeland Principals).

All five Defendants have now moved to dismiss the Amended Complaint.

## IV.    DISCUSSION

### A.    Legal Standard for a Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true. <u>Zutz v. Nelson</u>, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

<u>Id.</u> (citations omitted).

**B.     Evidence to Be Considered**

Defendants have submitted affidavits and exhibits in support of their motions to dismiss. BMO asserts that the Court should disregard these submissions.

"If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, a court may consider certain outside materials, such as matters of public record, materials

that do not contradict the complaint, exhibits attached to the complaint, and materials that are necessarily embraced by the pleadings, without converting the motion into one for summary judgment. <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999).

BMO requests that this Court not consider the extra-pleading materials. Here, the Court does not consider material outside the pleadings, such as affidavits that were previously filed in the Illinois action. However, documents clearly embraced by the Complaint, and whose authenticity has not been questioned, such as the Offering Memorandum, are admissible on a motion to dismiss and have been considered by the Court.

### C.   Failure to Plead Fraud with Particularity

#### 1.   Rule 9(b) Standard

Plaintiffs must plead allegations of fraud with particularity. Fed R. Civ. P. 9(b). Here, BMO has failed to plead fraud with particularity with regard to the misrepresentations alleged in Counts I and II, and underlying Counts III and IV. <u>See</u> <u>Filler v. Hanvit Bank</u>, 156 Fed. Appx. 413, 417 (2d Cir. 2005) ("[T]he particularity requirements of Rule 9(b) apply to claims of aiding and abetting fraud no less than to direct fraud claims.") (citing <u>Wight v. BankAmerica Corp.</u>,

219 F.3d 79, 91 (2d Cir. 2000)); <u>Carlson v. A.L.S. Enters., Inc.</u>, Civ. No. 07-3970

(RHK/JSM),2008 WL 185710, at *5 n.6 (D. Minn. Jan. 18, 2008) (holding that, when

underlying tort claim is dismissed under Rule 9(b), a claim for civil conspiracy to

commit that tort must also be dismissed, because, "in the absence of a viable tort

claim no conspiracy claim may lie") (citation omitted).

A pleading which alleges fraud or mistake must identify, "who, what,

where, when and how." <u>Parnes v. Gateway 2000, Inc.</u>, 122 F.3d 539, 550 (8th Cir.

1997). The facts alleged must "give Defendants notice of what conduct is

complained of and to prepare a defense to such claim of misconduct." <u>First

Presbyterian Church of Mankato, Minn. v. John G. Kinnard & Co.</u>, 881 F. Supp.

441, 445 (D. Minn. 1995) (citation omitted).

> "[A] plaintiff must specifically allege the 'circumstances constituting
> fraud,' Fed. R. Civ. P. 9(b), including 'such matters as the time, place
> and contents of false representations, as well as the identity of the
> person making the misrepresentation and what was obtained or
> given up thereby." However, "[w]here a plaintiff is not a party to a
> communication, particularity in pleading may become
> impracticable." Thus, courts will not "require, before discovery, the
> pleading of dates and times of communications in furtherance of a
> scheme to defraud, where the complaint alleges facts supporting the
> inference that the mails or wires were used."

Stark v. Monson, Civil No. 07-4373 (MJD/AJB), 2008 WL 189959, at *8 (D. Minn. Jan. 22, 2008) (quoting Abels v. Farmers Commodities Corp., 259 F.3d 910, 919 (8th Cir. 2001)).

> However, permitting fraud allegations to stand that do not even identify the speaker or the recipient of the fraud, would eviscerate Rule 9(b)'s requirement that fraud be pled with particularity. This is particularly true when there are multiple defendants-as the Complaint is currently pled, Defendants are not on notice of the claim against them because it is not clear which Defendants allegedly committed the fraudulent acts.

Id. at *9.

### 2. Speaker, Recipient, and the Group Publication Doctrine

Here, BMO fails to identify the bare minimum required by this Court in Stark: the speaker and the recipient of the fraud. Instead, throughout the Amended Complaint, BMO frequently refers to acts and representations by "Avalon and/or one more of the Lakeland Principals" and describes the recipient of communications as "the BMO parties," which it defines as "BMO, BMO Capital Markets Corp. and/or the lender." (Am. Compl. ¶ 1 n.3.) In only a handful of instances does the Complaint specify which Defendant made a particular statement.

> [W]hen a complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiff must take care to identify which

of them was responsible for the individual acts of fraud. If the requirements of Rule 9(b) were otherwise, a defendant would be forced to guess which allegations in the complaint were pleaded against it, rendering it difficult (if not impossible) to adequately frame a response, which is precisely the problem that Rule 9(b) was designed to remedy.

Moua v. Jani-King of Minn., Inc., 613 F. Supp. 2d 1103, 1111 (D. Minn. 2009) (citations omitted).

BMO argues that the Offering Memorandum, and other statements throughout the Complaint, are attributable to Avalon and the individual Defendants pursuant to the group pleading doctrine, under which, at the pleading stage only, the plaintiff may "rely on a presumption that statements in prospectuses, . . . press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." Freudenberg v. E*Trade Fin. Corp., – F. Supp. 2d –, 2010 WL 1904314, at *22 (S.D.N.Y. 2010) (citations omitted). The group pleading doctrine does not save the Amended Complaint in this case.

First, it is not clear that the group pleading doctrine is viable in this Circuit. See In re Hutchinson Tech., Inc. Sec. Litig., 536 F.3d 952, 961 n.6 (8th Cir. 2008) (noting that the Eighth Circuit has not addressed the continuing viability of the group pleading doctrine); Cummings v. Paramount Partners, LP, --- F. Supp.

2d ---, 2010 WL 2104630, at *33 n.5 (D. Minn. 2010) ("[T]here is some question

whether the group-publication doctrine (also known as the 'group-pleading

doctrine') has survived the passage of the PSLRA. . . .  There is even some

question among the Courts of this District.") (citations omitted).

Second, the doctrine is intended to apply to situations involving a plaintiff

who is otherwise unable to obtain information necessary to meet Rule 9(b)'s

requirements, such as a shareholder in a publicly held corporation.  The doctrine

is aimed at securities fraud cases, and this case involves common law torts.

Here, BMO agents were provided direct information through direct party-to-

party communications, not through mass publication.  This is in contrast to the

plaintiff-shareholders in <u>Freudenberg</u> who did not deal directly with

management.

Third, many of the allegations here are general allegations of fraudulent

conduct or are directed at alleged correspondence or oral communications that

would not be considered group publications.

Fourth, even if the doctrine were applicable to this case, BMO has still

wholly failed to meet Rule 9(b)'s requirements.  <u>See</u> <u>Freudenberg</u>, 2010 WL

1904314, at *5 (holding that plaintiff is still required to specify which statements

were fraudulent; identify the speaker; state where and when the statements were made; and explain why the statements were fraudulent). It does not even clearly state when it alleges that all or just some of the Defendants are responsible for certain acts, instead alleging responsibility by "Avalon and/or one more of the Lakeland Principals."

Moreover, BMO must allege the basis for employing the group pleading doctrine by pleading that "Defendants were involved in the preparation of the allegedly misleading statements." Copperstone v. TCSI Corp., No. C 97-3495, 1999 WL 33295869, at *16 (N.D. Cal. Jan. 19, 1999). See also Hutchinson Tech., Inc. Sec. Litig., 502 F. Supp. 2d at 901-02 (noting that, if complaint pleads "little more than the defendant's corporate titles, dates of employment, and attendance at quarterly meetings," the plaintiff may not rely on the group pleading doctrine) (citing City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 690 (6th Cir. 2005)), aff'd 536 F.3d 952 (8th Cir. 2008). For instance, BMO does not allege that Avalon was among the "individuals with direct involvement in the everyday business of the company." Freudenberg, 2010 WL 1904314, at *22. Instead, BMO alleges that Avalon was an "absentee owner." (Am. Compl. ¶ 34.)

### 3. Communication to BMO

Apart from the Amended Complaint's failure to clearly allege which Defendant made which misrepresentation, there is no clear allegation that any of the alleged misrepresentations were communicated to BMO. The Amended Complaint does not identify direct communications with BMO. BMO repeatedly uses the phrase "BMO parties" to describe the recipients of the information, but that vague category fails to meet Rule 9(b) requirements.

For example, the Offering Memorandum states on its cover page that it was "Prepared for: Harris Nesbit," not BMO. (According to Defendants, Harris Nesbit changed its name to BMOCM.) The Amended Complaint provides that "BMOCM does not make . . . the credit approval decision on behalf of the lender or liquidity provider." (Am. Compl. ¶ 129.) The Amended Complaint alleges that BMOCM "typically" passes on information to the lender and BMO, but does not explicitly allege that this occurred in this instance. The Amended Complaint does not clearly allege that BMO received the Offering Memorandum or actually learned of the telephone call with Waitt. It further fails to comply with Rule 9(b) by not specifying where, when, how, and from whom BMO may have learned of those statements.

### 4.     Further Objections to the Fraud Claims as Pled

Because the speakers and recipients of the alleged misrepresentations are not pled with specificity, Counts I through IV are dismissed without prejudice under Rule 9(b).  Defendants raise a host of other arguments regarding failure to state a claim in each of the four fraud counts, such as a failure to adequately allege causation or reliance and a lack of plausibility.  It would be fruitless to address whether BMO has adequately stated a claim in each of Counts I-IV when these counts already fail under Rule 9(b).  Currently, the Court cannot decipher which allegations relate to which Defendants.  Therefore, at this time, it will not address each Defendant's individual arguments regarding the viability of these counts.

## D.     Count V: Claim for Alter Ego Liability

Count V alleges that Defendants Avalon, Bassett, and Machacek should be held liable for breaches of contract by Lakeland and LCF Funding because they are alter egos of Defendants.

### 1.     Standard for Piercing the Corporate Veil

There is a "presumption of separateness" between a parent and subsidiary corporation.  <u>Ass'n of Mill & Elevator Mutual Ins. Co. v. Barzen Int'l, Inc.</u>, 553

N.W.2d 446, 449 (Minn. Ct. App. 1996) (citation omitted).  However, "[p]iercing

the corporate veil is an equitable remedy that may be applied in order to avoid

an injustice."  Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole, 766

N.W.2d 334, 339 (Minn. Ct. App. 2009) (citation omitted).  "A court may pierce

the corporate veil to hold a party liable for the acts of a corporate entity if the

entity is used for a fraudulent purpose or the party is the alter ego of the entity.

When using the alter ego theory to pierce the corporate veil, courts look to the

reality and not form, with how the corporation operated and the individual

defendant's relationship to that operation."  Id. (citations omitted).  The alter ego

liability doctrine applies to limited liability companies, such as Lakeland.  Minn.

Stat. § 322B.303, subd. 2.

Minnesota employs a two-prong test to decide whether a shareholder – or

subsidiary – can be liable for corporate obligations:

> The first prong focuses on the shareholder's relationship to the
> corporation.  Factors that are significant to the assessment of this
> relationship include whether there is insufficient capitalization for
> purposes of corporate undertaking, a failure to observe corporate
> formalities, nonpayment of dividends, insolvency of debtor
> corporation at time of transaction in question, siphoning of funds by
> dominant shareholder, nonfunctioning of other officers and
> directors, absence of corporate records, and existence of the
> corporation as merely a facade for individual dealings.  The second

prong requires showing that piercing the corporate veil is necessary
to avoid injustice or fundamental unfairness.

Barton v. Moore, 558 N.W.2d 746, 749 (Minn. 1997) (citations omitted); see also

Assoc. of Mill & Elevator Mutual Ins. Co., 553 N.W.2d at 449-50 (applying same

factors to parent-subsidiary analysis).

### 2. Whether Lakeland Was Formed as Avalon's Alter Ego

BMO alleges that Lakeland was insufficiently capitalized for its corporate

undertaking and was insolvent. (See Am. Compl. ¶¶ 194-210 (alleging that

Lakeland was insolvent with small loan loss reserves, lack of borrower equity,

and declining pay rates).) It further claims that Lakeland's limited liability

company form was abused and was merely a facade for Avalon's individual

dealings (id. ¶¶ 71, 73, 78, 81, 113-16, 125-26 (discussing Defendants' alleged

fraud, Avalon's complete control over Lakeland, and Defendants' financial

interests in Lakeland)); and that Avalon siphoned funds out of Lakeland and the

individual Defendant received benefits from that action (id. ¶¶ 211–13, 216, 219).

Avalon argues that this prong cannot be established merely by alleging

insolvency or inadequate capital. See, e.g., Tiger Team Techs., Inc. v. Synesi

Group, Inc., No. 06-1273 (ADM/AJB), 2009 WL 749814, at *4 (D. Minn. Mar. 18,

2009) (Montgomery, J.), aff'd 371 Fed. Appx. 90 (Fed. Cir. 2010); Ass'n of Mill &

Elevator Mutual Ins. Co., 553 N.W.2d at 450.  Avalon asserts that the Amended

Complaint fails to allege a failure to observe corporate formalities,

nonfunctioning officers or directors, absence of corporate records, or

commingling of funds.  It argues that BMO knew it was dealing with Lakeland,

not Avalon; it knew that Lakeland was a limited liability company, as stated in

the RFA; and it knew that the loan was made "on a non-recourse basis."  (Am.

Compl. ¶ 2.)

Avalon further argues that the fact that it could "exercise control over

Lakeland by virtue of its majority ownership" (Am. Compl. ¶ 248) is true of

almost every parent-subsidiary relationship.  It claims that BMO's allegation that

Avalon siphoned funds out of Lakeland in the form of loan and equity

redemptions and equity distributions (id. ¶¶ 211, 213), is false, because repaying

loans and paying dividends are not "siphoning," if the loan was properly

accounted for.  See Malcolm v. Franklin Drywall, Inc., No. 06-4155 (PAM/JSM),

2009 WL 690082, at *3 (D. Minn. Mar. 12, 2009).

The Court concludes that, as to Avalon, it is too early in the case to dismiss

this claim.  See Ahlm v. Rooney, 143 N.W.2d 65, 69 n.1 (Minn. 1966) (noting that,

even at summary judgment stage, alter ego claims usually should not be

disposed of due to the complex issues involved). BMO has alleged Avalon's complete control of Lakeland, its use of Lakeland to commit fraud to benefit itself, and Lakeland's insolvency. Whether the dividends and loan repayments were proper is not a question that the Court can definitively answer at this stage.

### 3. Failure to State a Claim Against Machacek or Basset

The Court dismisses this count as to Machacek and Basset. The Amended Complaint is based upon allegations that Avalon "controlled all aspects of Lakeland." (Am. Compl. ¶ 3.) There is no allegation that Basset or Machacek had control over Lakeland or Avalon. In fact, the Amended Complaint alleges the opposite – that they were puppets of Avalon and/or Lakeland.

The Amended Complaint fails to allege how, if Avalon had complete control over Lakeland, Bassett and Machacek were manipulating Lakeland for their own benefit. There is no allegation that either Defendant formed Lakeland to be his alter ego or mere instrumentality. Based on the facts pled in the Amended Complaint, it is not plausible that either man had the ability to exploit Lakeland as his alter ego. Their lack of control over Lakeland, combined with a failure to plead any of the other factors relevant to piercing the corporate veil, such as failure to observe corporate formalities, nonfunctioning officers or

directors, absence of corporate records, or commingling of funds, demonstrates that there is no viable claim.

### E.     Count VI: Unjust Enrichment

#### 1.     Elements of Unjust Enrichment

BMO alleges that Lakeland should have used its money to pay BMO rather than Avalon.  (Am. Compl. ¶¶ 262, 264, 265.)  Therefore, Avalon was unjustly enriched by receiving those funds.

"To establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled and that the circumstances are such that it would be unjust for that person to retain the benefit."  <u>Mon-Ray, Inc. v. Granite Re, Inc.</u>, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004) (citations omitted).  The enriched party must gain the benefit "illegally or unlawfully."  <u>Id.</u>  Further, "[w]here the rights of the parties are governed by a valid contract, a claim for unjust enrichment must fail and summary judgment is appropriate."  <u>Colangelo v. Norwest Mortgage, Inc.</u>, 598 N.W.2d 14, 19 (Minn. Ct. App. 1999).

## 2.     Existence of a Contract or Fraud Claim

Avalon asserts that BMO cannot use the equitable principle of unjust enrichment to transform its non-recourse loan into a recourse loan or to gain a right to Lakeland's assets for which it never bargained.  First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 504 (Minn. 1981).  The RFA did not prohibit Lakeland from paying off Avalon's loans, declaring dividends, or redeeming Avalon's equity.  Avalon argues that BMO's failure to obtain Avalon's signature to, or guarantee of, the RFA bars BMO's claim.

Avalon further notes that Count VI does not explicitly mention fraud. Avalon concludes that, even if it did, the unjust enrichment claim would be dismissed because BMO could pursue its remedy at law.  However, at this early stage of the litigation, BMO is permitted to plead in the alternative.  See Daigle v. Ford Motor Co., --- F. Supp. 2d ----, 2010 WL 1875521, at *5 (D. Minn. May 10, 2010).

BMO has alleged that Avalon became unjustly enriched through illegal and unlawful means by virtue of its control over Lakeland, abuse of Lakeland's corporate form, and siphoning of Lakeland funds belonging to BMO.  At this point, it does not appear to have a contract claim against Avalon, because there

was no contract between BMO and Avalon.  The fraud claims have been

dismissed, but, in any case, the Rules of Civil Procedure permits BMO to plead in

the alternative at this stage of the litigation.

### 3.    Conferral of a Benefit on Avalon

Avalon asserts that the only benefit it received was from Lakeland, and,

therefore, the Lakeland Receiver is the only party entitled to assert the claim.

Moreover, the RFA loan was made to a subsidiary of Lakeland; there is no

assertion that any money went from BMO to Avalon.  Avalon concludes that if

anyone was unjustly enriched, it was Lakeland, and, as asserted in the

Bartholomew case, Lakeland's Receiver has the valid claim, in the form of a

fraudulent transfer claim.

BMO retorts that there is no requirement that a "plaintiff itself must have

conferred the benefit sought to be recovered from the defendant."  Iconco v.

Jenson Constr. Co., 622 F.2d 1291, 1301-02 (8th Cir. 1980) (applying Iowa law).

"In general, recovery for unjust enrichment is based upon what the person

enriched has received rather than what the opposing party has lost."  Anderson

v. DeLisle, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984).

BMO alleges that Avalon obtained more than $100 million from Lakeland. (Am. Compl. ¶ 257-58.) It claims that the advance of the $150 million loan to Lakeland conferred a benefit on Avalon by virtue of Lakeland's resulting improved liquidity position. (Id. ¶ 73.) Avalon then received considerable distributions from Lakeland, which left the Lakeland entities insolvent or undercapitalized and unable to fulfill loan obligations when the funds should have been turned over to BMO or used to support its collateral. (Id. ¶ 8.) Also, Lakeland made distributions to Avalon at a time when Lakeland was suffering a net loss and BMO was entitled to the benefit, use, and value of the funds. All the while, Avalon exercised complete control over Lakeland's actions.

The Court concludes that these allegations sufficiently state a claim for unjust enrichment.

### 4.     Impact of the Receiver Action

As for the parties' cursory argument regarding the implications of the Bartholomew action, the Court finds no basis to dismiss this count for failure to state a claim based its ruling on a motion to dismiss in a separate case. Discovery may reveal the overlap of these two cases; however, at this stage, in this case, BMO has adequately stated a claim for unjust enrichment.

### F. Count VII: Conspiracy to Breach Contract

The Court dismisses Count VII for failure to state a claim. Minnesota law requires a tort to underlie a conspiracy claim, and simply breaching a contract is not a tort.

Under Minnesota law, "a civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability, and hence such a 'claim' is dependent upon a valid underlying tort claim." Carlson v. A.L.S. Enters., Inc., Civ. No. 07-3970 (RHK/JSM), 2008 WL 185710, at *5 (D. Minn. Jan. 18, 2008); D.A.B. v. Brown, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) ("In addition, the conspiracy count fails because it is not supported by an underlying tort.") (citation omitted). Because breach of contract is not a tort, there can be no claim for conspiracy to breach a contract, as distinguished from conspiracy to commit tortious interference with a contract.

The Court rejects BMO's contention that the Minnesota Court of Appeals has ruled otherwise. The Minnesota Court of Appeals' brief statement that "[b]ecause no contract exists, the trial court properly dismissed appellants' claim[] of . . . conspiracy to breach a contract," Hansen v. Phillips Beverage Co., 487 N.W.2d 925, 927 (Minn. Ct. App. 1992), does not vitiate the requirement of an

underlying tort.  The <u>Hansen</u> court simply dismissed the claim for conspiracy to

breach a contract based on one of the multiple reasons that the claim failed.  It

did not address whatsoever the question of whether a breach of contract could

underlie a valid conspiracy claim.  This Court does not interpret the <u>Hansen</u>

court's statement to hold that breach of contract is now considered a tort under

Minnesota law.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1. Defendant Anthony Bassett's Motion to Dismiss the Amended Complaint [Docket No. 14] is **GRANTED**, and all claims against Bassett are dismissed, as set forth in paragraph 6, below.

2. Defendant Avalon Capital Group, Inc.'s Motion to Dismiss the Amended Complaint [Docket No. 20] is **GRANTED IN PART** and **DENIED IN PART**, as set forth in paragraph 6, below.

3. Defendant Joseph Burke's Motion to Dismiss Amended Complaint [Docket No. 25] is **GRANTED,** and all claims against Burke are dismissed, as set forth in paragraph 6, below.

4. Defendant Robert J. Machacek's Motion to Dismiss the Amended Complaint [Docket No. 33] is **GRANTED,** and all claims against Machacek are dismissed, as set forth in paragraph 6, below.

5. Defendant William D. Murray's Motion to Dismiss Amended Complaint [Docket No. 39] is **GRANTED,** and all claims against Murray are dismissed, as set forth in paragraph 6, below.

6.    The counts of the Amended Complaint are disposed of as follows:

    a.    The following counts are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 9(b): Count I: Fraud, Intentional Misrepresentation and Fraudulent Concealment (Avalon and Lakeland Principals); Count II: Negligent Misrepresentation (Avalon and Lakeland Principals); Count III: Aiding and Abetting Misrepresentation and Concealment (Avalon and the Lakeland Principals); and Count IV: Civil Conspiracy (Avalon and Lakeland Principals).

    b.    Count V: Sham Transaction/Alter Ego Liability (Avalon, Bassett and Machacek) is **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted as to Bassett and Machacek and **REMAINS** as to Avalon.

    c.    Count VI: Unjust Enrichment (Avalon) **REMAINS**.

    d.    Count VII: Conspiracy to Breach Contract (Avalon and Lakeland Principals) is **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted.


Dated:  September 30, 2010          s/ Michael J. Davis_____
                                                  Michael J. Davis
                                                  Chief Judge
                                                  United States District Court