## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

BANK OF MONTREAL,

        Plaintiff,


v.                                     **MEMORANDUM OF LAW & ORDER**
                                       Civil File No. 10-591 (MJD/AJB)


AVALON CAPITAL GROUP, INC.,
and THEODORE W. WAITT,

        Defendants.

---

Christopher R. Morris and Lewis A. Remele, Jr., Bassford Remele, PA, and
James M. Heiser, James E. Spiotto, and Mark D. Rasmussen, Chapman and
Cutler, LLP, Counsel for Plaintiff Bank of Montreal.

David M. Schiffman, James F. Bendernagel, Jr., Jennifer A. Ratner, and
Meredith Jenkins Laval,  Sidley Austin LLP, and Jason R. Asmus, Richard
D. Anderson, and Richard G. Mark, Briggs & Morgan, PA, Counsel for
Defendant Avalon Capital Group, Inc.

Leah Ceee O. Boomsma and Samuel L. Hanson, Briggs & Morgan, PA,
Counsel for Defendant Theodore W. Waitt.

---

## I.    INTRODUCTION

This matter is before the Court on Defendant Theodore W. Waitt's Motion

to Dismiss the Second Amended Complaint [Docket No. 110] and on Defendant

Avalon Capital Group, Inc.'s Motion to Dismiss the Second Amended Complaint

[Docket No. 113].  The Court heard oral argument on March 9, 2012.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Plaintiff is Bank of Montreal ("BMO"), a Canadian chartered bank that

operates through its Chicago branch.  (Second Amended Complaint ("SAC") ¶

10.)  BMO's affiliate, BMO Capital Markets Corp. ("BMOCM") was involved in

the facts of this case.  (Id. ¶ 92.)  "BMOCM does not make loans or the credit

approval decision on behalf of the lender or liquidity provider in transactions

similar to and including the [transaction at issue in this case]; rather it served, in

[this case], in an agency capacity for the lender and obtained facts and other

information which it passed on to the lender and BMO so that the lender and

BMO could make their own independent credit decisions." (Id. ¶ 275.)  BMOCM

was formerly known as Harris Nesbitt.

BMO claims that it lost approximately $120 million from the $150 million

that it loaned to Lakeland Construction Finance, LLC ("Lakeland") and its

wholly owned subsidiary, LCF Funding I, LLC ("LCF Funding") (collectively,

the "Lakeland Entities").  (SAC ¶¶ 1-7.)   Lakeland is a Minnesota-based limited

2

liability finance company that extended credit to developers, contractors, and builders of residential homes and developments in Minnesota, Wisconsin, and South Carolina. (Id. ¶¶ 13, 15.) It was founded in 1999. (Id. ¶ 15.) Lakeland is currently in receivership in Minnesota state court. (Id. ¶ 13.) LCF Funding is a Delaware limited liability company with its principal place of business in Minnesota. (Id. ¶ 14.) It was formed by Lakeland for the purpose of the securitization transaction at issue in this lawsuit. (Id.)

Defendant Avalon Capital Group, Inc. ("Avalon"), a Delaware corporation, was Lakeland's original equity investor, a majority and controlling membership interest holder of Lakeland, and Lakeland's sole manager. (SAC ¶¶ 11, 22, 24.)

Defendant Theodore W. Waitt founded, owned, and controlled Avalon. (Id. ¶¶ 11, 20.)

Robert Machacek was the chief operating officer of Lakeland. (SAC ¶ 30.) He co-founded Lakeland in 1999. (Id. ¶ 29.) Machacek had a prior federal felony conviction for two counts of mail fraud. (Id. ¶ 32.) His supervised release ended in 2005. (Id.)

### 2.      The "Bob Problem"

BMO refers to an issue in this case as the "Bob Problem."  (SAC ¶ 31.)  The

"Bob Problem" refers to Machacek overseeing Lakeland's lending officers and

being responsible for all aspects of loan origination, approval, documentation,

collection, and portfolio management.  (Id. ¶¶ 30-31.)  The Bob Problem was that

Machacek had a prior federal felony (id. ¶ 32) and caused Lakeland to originate

loans that did not comply with Lakeland's underwriting standards (id. ¶ 33).  He

also had a difficult and belligerent work personality and made rogue and

insubordinate decisions.  (Id. ¶¶ 42-43, 52)  Defendants knew and were aware of

the Bob Problem.  (Id. ¶¶ 34-35, 37-43.)

During the summer of 2005, Waitt directed Lakeland to terminate

Machacek as soon as possible.  (SAC ¶ 69.)  During this time, Lakeland was

overextended and Machacek's over-origination caused a $25 million liquidity

shortfall.  (Id. ¶ 67.)  In June 2005, Avalon infused money into Lakeland, because

no other funding was available.  (Id. ¶¶ 66-67.)

In October 2005, Waitt directed Lakeland to "find a buyer for my

preferred" shares and develop a plan for Lakeland to pay cash tax distributions

to Avalon.  (SAC ¶ 84.)  Waitt told Lakeland to pursue a securitization

transaction as "a way for all of us to receive cash distributions while continuing

to improve enterprise value which is the real win." (Id. ¶ 85.)  Avalon also

directed Lakeland to prioritize "getting some cash off the table for [Waitt]."  (Id.)

### 3.    Lakeland Seeks Financing

During the fall of 2005, Lakeland courted BMO to finance a potential

securitization of Lakeland's loans and serve as the liquidity provider, or ultimate

bearer of credit risk.  (SAC ¶¶ 88-91.)

During the due diligence process, Lakeland provided information to BMO

through BMOCM in a September 2005 Offering Memorandum, highlighting

Lakeland's alleged strengths which made it an attractive investment, such as the

conservative advance rates in its portfolio, the assurance that that Lakeland's

loans would meet certain underwriting guidelines and servicing policies, and

that there were minimal risks from housing price declines because the Twin

Cities market had been stable.  (SAC ¶¶ 92-94.)  BMO was induced to believe that

these practices would safeguard BMO from any housing market downturn.  (Id.

¶ 95.)  The Offering Memorandum also disclosed that Machacek had a prior

felony conviction, but did not disclose any other aspect of the Bob Problem.  (Id.

¶ 93.)

In October 2005, Lakeland provided a memorandum purporting to explain the circumstances surrounding Machacek's conviction.  (SAC ¶ 99.)  The memorandum stated that Machacek "has remained an important member of Lakeland's management team and has been instrumental in its growth and success" and was not involved in any of Lakeland's cash management functions. (Id. ¶ 99.)

### 4.     The Waitt Telephone Call

On October 10, 2005, Lakeland told Waitt that Machacek's criminal past was an issue with BMO and asked Waitt to speak to Bart Steenbergen regarding why Waitt felt comfortable with Machacek as a manager.  (SAC ¶ 101-05.) Steenbergen was a BMOCM employee, not a BMO employee.  (Id. ¶ 93.)

On October 13, 2005, Waitt called Steenbergen and Steenbergen's supervisor.  (SAC ¶ 109.)  During the telephone call, Waitt made various positive comments regarding Machacek's role at Lakeland and made no mention of the Bob Problem, Machacek's true role at Lakeland, or Waitt's efforts to terminate Machacek.  (Id. ¶¶ 111-13, 118-19.)  At about the same time, Lakeland's CEO made similar statements to Steenbergen.  (Id. ¶ 127.)

On October 28, 2005, Steenbergen met with Lakeland officers to discuss Lakeland's "controls, procedures and systems" that had been implemented. (SAC ¶ 132.)  At the time, Lakeland and Defendants knew that Lakeland's processes and controls were non-compliant with many of the underwriting policies being represented to BMO.  (Id. ¶ 133.) Lakeland did not reveal its knowledge of the Bob Problem at this meeting.

BMO asserts that Waitt and Avalon authorized every act that Lakeland was required to take in entering into and performing its obligations under the securitization with BMO.  (SAC ¶¶ 135-38.)

### 5.      The Original Securitization

The BMO securitization closed on December 23, 2005.  (SAC ¶ 139.)  On December 28, 2005, Lakeland paid Avalon $2.7 million, representing deferred payments of preferred distribution, loan interest, and a line of credit fee.  (Id. ¶ 140.)

### 6.      Events After the Execution of the Original Securitization

Lakeland's financial problems continued after the securitization, and it still could not control Machacek.  (SAC ¶¶ 145, 147-51, 154-60.)   BMO asserts that, because Avalon refused to put any more money into Lakeland, Lakeland was

encouraged to commit fraud, such as supplying false borrowing base certificates to BMO.  (Id. ¶¶ 5, 219-21, 231.)

In November 2006, Waitt learned that Lakeland was not running credit checks on its borrowers.  (SAC ¶ 156.)  In December 2006, Waitt stated that Lakeland could no longer issue development loans without his approval.  (Id. ¶¶ 163-67.)

### 7.    The Amended RFA

In December 2006, LCF Funding entered into the Amended and Restated Receivables Financing Agreement ("RFA").   (SAC ¶ 164.)  The RFA was part of a securitization transaction in which BMO acted as the "Liquidity Provider" for a lender, Fairway Finance Co. ("Fairway").  (Id. ¶¶ 273, 276.)  BMOCM was installed as the lender's Administrative Agent.  (SAC ¶ 92; RFA § 11.1.)  Under the RFA, Fairway provided a $150 million loan (the "RFA Loan") to LCF Funding.  (SAC ¶ 278.)  LCF Funding used the money to buy mortgage loans that Lakeland had extended to home builders and developers, which were then pledged as collateral under the RFA.  Lakeland acted as the "Servicer" for these loans.  (Id. ¶ 282.)

### 8.   Machacek's Departure

In 2007, Defendants further pursued their plan to fire Machacek. However, Waitt was concerned that if Lakeland terminated Machacek and truthfully disclosed the reasons for the firing, the banks would call Lakeland's loans.  (SAC ¶ 188.)  Also, according to BMO, due to Lakeland's key man and material adverse change covenants in the RFA, BMO was entitled to approve Machacek's replacement.  (Id. ¶¶ 184-85, 194, 196.)  Therefore, instead of firing Machacek for "good reason," under his employment agreement, Waitt, Avalon, and Lakeland entered into a transition agreement with Machacek in the spring of 2007 and directed Lakeland to tell its lenders that Machacek was leaving for personal reasons and would be transitioning his duties for the remainder of 2007. (Id. ¶¶ 181, 184-86.)  Machacek was instructed to tell Lakeland's lenders that his departure was positive.  (Id. ¶ 187.)

In June 2007, Lakeland told BMO that Machacek was leaving for personal reasons so that he could pursue other opportunities.  (SAC ¶ 192.)  Burke did not tell BMO that its collateral base was deteriorating or the true reasons for Machacek's departure.  (Id. ¶ 193-97.)

In July 2007, Lakeland courted the Bank of Scotland ("BoS") to refinance Lakeland's credit facility from which Avalon was seeking to obtain $65 million.

9

(SAC ¶ 203.)  In October 2007, Lakeland closed the BoS refinancing, and Avalon received $67.5 million.  (Id. ¶ 207.)

On January 31, 2008, LCF Funding and Lakeland formally defaulted on the securitization.  (SAC ¶¶ 216, 280, 283, 291.)

BMO asserts that Defendants committed fraud in inducing BMO to enter into the securitization and in administering the RFA Loan.  BMO asserts that it suffered damages of more than $120 million.  (SAC ¶¶ 6, 177, 306.)  It claims that Lakeland wrongfully obtained more than $124 million from the securitization, which could otherwise have been collateral to secure BMO's risk.  (Id. ¶ 266.)  Additionally, due to the BMO securitization, Avalon did not have to contribute $124 million of additional capital into Lakeland.  (Id. ¶¶ 264-68.)

### B.      Procedural History

#### 1.      The Receiver Action

This Court presided over the related case of Bartholomew v. Avalon Capital Group, Inc., Civil File No. 09-1279 (MJD/AJB).  In that case, the Lakeland Receiver sued Avalon to recover certain money transferred from Lakeland to Avalon.  On November 30, 2009, the Court entered an Order denying Avalon's motion to dismiss that complaint.  The parties to that case reached a settlement, and the case was dismissed in January 2012.

## 2.      The Current Action

On March 2, 2010, BMO filed a Complaint against Avalon, Machacek, and three Lakeland officers, Joseph Burke, Anthony Bassett and William Murray, in this Court.  [Docket No. 1]  On March 18, 2010, BMO filed an Amended Complaint against the same five Defendants.  [Docket No. 7]  The Amended Complaint alleged: Count One: Fraud, Intentional Misrepresentation and Fraudulent Concealment (Avalon and Lakeland Principals); Count Two: Negligent Misrepresentation (Avalon and Lakeland Principals); Count Three: Aiding and Abetting Misrepresentation and Concealment (Avalon and the Lakeland Principals); Count Four: Civil Conspiracy (Avalon and Lakeland Principals); Count Five: Sham Transaction/Alter Ego Liability (Avalon, Bassett and Machacek); Count Six: Unjust Enrichment (Avalon); and Count Seven: Conspiracy to Breach Contract (Avalon and Lakeland Principals).

On September 30, 2010, the Court dismissed all claims against Bassett, Burke, Murray, and Machacek.  Bank of Montreal v. Avalon Capital Group, Inc., 743 F. Supp. 2d 1021 (D. Minn. 2010).  The Court further dismissed, without prejudice, the fraud claims against Avalon because, among other reasons, the Amended Complaint "fail[ed] to comply with Rule 9(b) by not specifying where,

when, how, and from whom BMO may have learned of those statements [in the

Offering Memorandum or the Waitt telephone call]."  Id. at 1030.

On October 20, 2011, BMO filed the Second Amended Complaint ("SAC").

The SAC names Avalon and Waitt as the sole Defendants.  The SAC alleges:

Count One: Fraud, Intentional Misrepresentation and Fraudulent Concealment

(Avalon); Count Two: Fraud, Intentional Misrepresentation and Fraudulent

Concealment (Waitt); Count Three: Negligent Misrepresentations (Avalon);

Count Four: Negligent Misrepresentations (Waitt); Count Five: Aiding and

Abetting Misrepresentations and Omissions (Avalon); Count Six: Aiding and

Abetting Misrepresentations and Omissions (Waitt); Count Seven: Veil Piercing

of Lakeland Entities/Alter Ego Liability (Avalon); Count Eight: Veil Piercing of

Lakeland Entities – Avalon/Alter Ego Liability (Waitt); Count Nine: Unjust

Enrichment (Avalon); and Count Ten: Unjust Enrichment (Waitt).

Defendants now move to dismiss all counts against them.

## III.   DISCUSSION

### A.    Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may

move the Court to dismiss a claim if, on the pleadings, a party has failed to state

a claim upon which relief may be granted.  In reviewing a motion to dismiss, the

Court takes all facts alleged in the complaint to be true.  <u>Zutz v. Nelson</u>, 601 F.3d

842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is
> plausible on its face.  Thus, although a complaint need not include
> detailed factual allegations, a plaintiff's obligation to provide the
> grounds of his entitlement to relief requires more than labels and
> conclusions, and a formulaic recitation of the elements of a cause of
> action will not do.

<u>Id.</u> (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint,

matters of public record, orders, materials embraced by the complaint, and

exhibits attached to the complaint."  <u>PureChoice, Inc. v. Macke</u>, Civil No. 07-

1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing <u>Porous Media Corp.

v. Pall Corp.,</u> 186 F.3d 1077, 1079 (8th Circ. 1999)).

**B.    Rule 9(b) Standard**

"In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P.

9(b).  Minnesota law considers an allegation of misrepresentation, "whether

labeled as a claim of fraudulent misrepresentation or negligent misrepresentation

[to be] an allegation of fraud which must be pled with particularity," and such a

claim is subject to Federal Rule of Civil Procedure 9(b).  <u>Trooien v. Mansour</u>, 608

F.3d 1020, 1028 (8th Cir. 2010) (citation omitted).

> To satisfy Rule 9(b),
>
> the complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.  In other words, the complaint must plead the "who, what, where, when, and how" of the alleged fraud.

<u>Drobnak v. Andersen Corp.</u>, 561 F.3d 778, 783 (8th Cir. 2009) (citations omitted).

The particularity requirement "is intended to enable the defendant to

respond specifically and quickly to the potentially damaging allegations.

[C]onclusory allegations that a defendant's conduct was fraudulent and

deceptive are not sufficient to satisfy the rule."  <u>Id.</u> (citations omitted).

### C. Counts One through Four: Fraud and Negligent Misrepresentation Claims

#### 1. Elements of Fraud and Negligent Misrepresentation

Under Minnesota law, a fraud claim must plead

> with specificity that there was a false representation regarding a past or present fact, the fact was material and susceptible of knowledge, the representer knew it was false or asserted it as his or her own knowledge without knowing whether it was true or false, the representer intended to induce the claimant to act or justify the claimant in acting, the claimant was induced to act or justified in acting in reliance on the representation, the claimant suffered

damages, and the representation was the proximate cause of the damages.

<u>Martens v. Minn. Min. & Mfg. Co.</u>, 616 N.W.2d 732, 747 (Minn. 2000) (citations omitted).

Failure to disclose material facts may constitute fraudulent concealment.

<u>Consol. Foods Corp. v. Pearson</u>, 178 N.W.2d 223, 225-26 (1970).  "Before nondisclosure may constitute fraud, however, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him."

<u>Richfield Bank & Trust Co. v. Sjogren</u>, 244 N.W.2d 648, 650 (Minn. 1976) (citation omitted).  "As a general rule, one party to a transaction has no duty to disclose material facts to the other."  <u>Id.</u> (citation omitted).  However, such a duty may arise in one of the following three circumstances:

>   (a) One who speaks must say enough to prevent his words from misleading the other party.
>
>   (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party.
>
>   (c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts.

<u>Id.</u> (citations omitted).

Additionally, as to the negligent misrepresentation claim,

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Florenzano v. Olson, 387 N.W.2d 168, 174 n.3 (Minn. 1986) (citation omitted).  "A misrepresentation is made negligently when the misrepresenter has not discovered or communicated certain information that the ordinary person in his or her position would have discovered or communicated."  Id. at 174.  "[O]ne making representations is held to this duty of care only when supplying information, either for the guidance of others in the course of a transaction in which one has a pecuniary interest, or in the course of one's business, profession or employment."  Id. (citation omitted).

### 2.      Whether the SAC Alleges that Waitt's Telephone Call Was Conveyed to BMO

Counts One through Four, the direct fraud and negligent misrepresentation counts, are based solely on the short telephone conversation between Waitt and employees of BMOCM.

In its September 30 Order, this Court dismissed BMO's misrepresentation

claims for failure to plead fraud with particularity because

> [a]part from the Amended Complaint's failure to clearly allege
> which Defendant made which misrepresentation, there is no clear
> allegation that any of the alleged misrepresentations were
> communicated to BMO.  The Amended Complaint does not identify
> direct communications with BMO.

Bank of Montreal, 743 F. Supp. 2d at 1029-30.  The Court noted: "The Amended

Complaint does not clearly allege that BMO received the Offering Memorandum

or actually learned of the telephone call with Waitt.  It further fails to comply

with Rule 9(b) by not specifying where, when, how, and from whom BMO may

have learned of those statements."  Id. at 1030.

Over one year has passed since this Court's Order.  BMO has filed a

Second Amended Complaint that is extensive and detailed.  However, the SAC

fails to allege that the contents of the Waitt call were actually communicated to

BMO.  The information regarding whether and how BMO learned of the contents

of the Waitt call is information uniquely within BMO's knowledge.

A fraud or negligent misrepresentation claim cannot survive unless the

alleged misrepresentation was actually "repeated to a person to whom [the

defendant] intends or has reason to expect to have it repeated."  Restatement

(Second) of Torts § 533, cmt. g; <u>LaFleche v. Clark Prods., Inc.,</u> No. Civ. 05-2549

(MJD/AJB), 2007 WL 2023564, at *15 (D. Minn. July 9, 2007) (holding that plaintiff

"cannot sustain a misrepresentation claim" based on a representation that was

conveyed to a third party, but not passed on to the plaintiff before he signed the

purchase agreement).  Under Minnesota law, one of the elements of a claim of

fraudulent misrepresentation is "communication of the false statement to

plaintiff."  <u>Moore v. McGraw Edison Co.,</u> 804 F.2d 1026, 1034 (8th Cir. 1986).).

The Court's holding is clear: BMO cannot assert a claim based on

Defendants' statements to BMOCM/Steenbergen unless those statements were

actually conveyed to **<u>BMO</u>**.  It is not enough to allege that Defendants intended

the statements to be conveyed to BMO.

Therefore, Counts One through Four are dismissed.  BMO has 30 days

from the date of this Order to amend its SAC to clearly allege that the alleged

misrepresentations in the Waitt telephone call were conveyed to **<u>BMO</u>**, and

when and how that conveyance occurred.  If BMO fails to plead conveyance of

the alleged misrepresentations to BMO, all claims based on the Waitt telephone

call are dismissed with prejudice.

### D.     Plausibility of Allegations in Counts One Through Six

Defendants assert that Counts One through Six, the direct and aiding and abetting fraud claims, should be dismissed because they are implausible. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This is not a "probability requirement," but only requires "more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court denies Defendant's motion to dismiss based on implausibility. Overall, Defendants argue that it is implausible that they would engage in a scheme that would work against their own financial interests and have little chance of success. BMO alleges that, at some point, Defendants knew that Lakeland was in trouble and that their money was at risk, so they attempted to shift the risk to BMO by fraudulently inducing it to enter the RFA and lulling BMO into not investigating Lakeland's financial soundness. According to this theory, Defendants put more money into Lakeland to avoid immediate default, in the hopes of later extracting their investment, leaving BMO holding the bag.

This theory is not lacking in plausibility.  Defendants' other arguments regarding

implausibility similarly fail.  This matter is not at the trial stage.  This Court's role

is not to decide which scenario is most likely or reasonable.  BMO's theories are

plausible, and that is all that is required.

>    **E.    Counts Five and Six: Aiding and Abetting**

A claim for aiding and abetting the tortious conduct of another requires

the following elements:

>    (1) the primary tort-feasor must commit a tort that causes an injury
>    to the plaintiff;
>
>    (2) the defendant must know that the primary tort-feasor's conduct
>    constitutes a breach of duty; and
>
>    (3) the defendant must substantially assist or encourage the primary
>    tort-feasor in the achievement of the breach.

Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999)

(citation omitted).  The Court evaluates the elements of knowledge and

substantial assistance "in tandem."  Id. at 188.

BMO asserts that the primary tortfeasor for this claim is Lakeland and that

Defendants aided and abetted Lakeland's misrepresentations on three subjects:

the negotiation of the RFA, the administration of the RFA loan, and Machacek's

departure from Lakeland.  The Court has reviewed the SAC and concludes that,

at this stage of the litigation, the SAC states a claim for aiding and abetting

misrepresentations and omissions with regard to these allegations.  Overall,

BMO does allege that, at Defendants' direction, Lakeland concealed material

negative information about Lakeland and Machacek from BMO – and made false

statements about Lakeland and Machacek to BMO – with the intention of

inducing BMO to enter and perform the RFA.  With regard to Lakeland's

falsified certificates, the facts pled in the SAC are sufficient to create a plausible

implication of constructive knowledge of clearly tortious or illegal conduct.  See

Witzman, 601 N.W.2d at 188.  The SAC identifies, with particularity, the alleged

misrepresentations and omissions that form the bases for the aiding and abetting

claims.  Although, viewed in isolation, particular statements in the Offering

Memorandum or in connection with Machacek's departure might appear to be

literally true or inactionable opinion or puffery, the Court views the alleged

statements in context and, at this stage, cannot state that, as a matter of law, they

are inactionable.  See In re Nash Finch Co., 502 F. Supp. 2d 861, 879 (D. Minn.

2007) (holding that statements which, "[t]aken out of context, . . . are vague and

such obvious hyperbole that no reasonable investor would rely upon them . . .

while not independently actionable, can be considered in context, and as part of

Defendants' larger statements, are not immaterial puffery") (citation omitted);

First Presbyterian Church of Mankato, Minn. v. John G. Kinnard & Co., Inc., 881

F. Supp. 441, 444 (D. Minn. 1995) ("It is certainly true that statements such as

'performing well' or 'low risk' are plainly expressions of opinion and, standing

alone, are not actionable.  However, as Plaintiff argues, the court must view the

statements in context to determine whether Plaintiffs' claims are sufficient.")

(citation omitted).  See also Swedeen v. Swedeen, 134 N.W.2d 871, 878 (Minn.

1965) ("A statement literally true is actionable, if made to create an impression

substantially false.").  Finally, at this stage, the Court cannot hold that, as a

matter of law, reliance on statements in the Offering Memorandum would have

been unreasonable given the general warnings included in that document.

### F. Counts Seven and Eight: Piercing the Corporate Veil and Alter-Ego Liability

#### 1. Standard for Piercing the Corporate Veil

As the Court explained in its September 30 Order, there is a "presumption

of separateness" between a parent and subsidiary corporation.  Ass'n of Mill &

Elevator Mut. Ins. Co. v. Barzen Int'l, Inc., 553 N.W.2d 446, 449 (Minn. Ct. App.

1996) (citation omitted).  However, "[p]iercing the corporate veil is an equitable

remedy that may be applied in order to avoid an injustice."  Equity Trust Co.

Custodian ex rel. Eisenmenger IRA v. Cole, 766 N.W.2d 334, 339 (Minn. Ct. App.

2009) (citation omitted).  "A court may pierce the corporate veil to hold a party

liable for the acts of a corporate entity if the entity is used for a fraudulent

purpose or the party is the alter ego of the entity.  When using the alter ego

theory to pierce the corporate veil, courts look to the reality and not form, with

how the corporation operated and the individual defendant's relationship to that

operation."  Id. (citations omitted).  The alter ego liability doctrine applies to

limited liability companies, such as Lakeland.  Minn. Stat. § 322B.303, subd. 2.

Minnesota employs a two-prong test to decide whether a shareholder – or

subsidiary – can be liable for corporate obligations:

> The first prong focuses on the shareholder's relationship to the
> corporation.  Factors that are significant to the assessment of this
> relationship include whether there is insufficient capitalization for
> purposes of corporate undertaking, a failure to observe corporate
> formalities, nonpayment of dividends, insolvency of debtor
> corporation at time of transaction in question, siphoning of funds by
> dominant shareholder, nonfunctioning of other officers and
> directors, absence of corporate records, and existence of the
> corporation as merely a facade for individual dealings.  The second
> prong requires showing that piercing the corporate veil is necessary
> to avoid injustice or fundamental unfairness.

Barton v. Moore, 558 N.W.2d 746, 749 (Minn. 1997) (citations omitted); see also

Assoc. of Mill & Elevator Mut. Ins. Co., 553 N.W.2d at 449-50 (applying same

factors to parent-subsidiary analysis).

### 2.    Avalon

The Court already considered and denied Avalon's motion to dismiss

BMO's veil-piercing and alter-ego claim in its September 30 Order.  In that

Order, the Court evaluated both prongs of the Victoria Elevator test and found

that the claim passed both.  Avalon raises the same issues here.  As the Court

previously held, "it is too early in the case to dismiss this claim."  Bank of

Montreal, 743 F. Supp. 2d at 1031.  As in the Amended Complaint, the SAC

clearly alleges multiple factors for disregarding the corporate form, including

that Lakeland was insufficiently capitalized and insolvent (SAC ¶¶ 247-263); that

its limited liability form was abused and was a façade for Avalon's individual

dealings (see, e.g., id. ¶¶ 370-77); and that Avalon siphoned funds out of

Lakeland (id. ¶ 377).  The SAC also alleges that the abuse of the corporate form

was used to commit fraud.  (Id. ¶ 378.)

Based on similar allegations, the Court denied Avalon's first motion to

dismiss.  Bank of Montreal, 743 F. Supp. 2d at 1031.  The Court again denies the

motion to dismiss the alter ego count against Avalon.

### 3.    Waitt

The Court holds that the SAC states a claim for alter ego liability against

Waitt.  Waitt argues that the alter ego claim must fail because he is not personally

a shareholder of Lakeland, rather, his investment in Lakeland is held by Avalon,

and BMO must first pierce Avalon's corporate veil to even reach the alter ego

issue for Waitt.  Waitt argues that the SAC is deficient because it does not

address any of the factors for disregarding the corporate form with regard to

Avalon.  Nor does the SAC allege any injustice or unfairness if Waitt is not held

personally responsible for Avalon's liabilities.

Avalon's intervening position between Waitt and the Lakeland Entities

does not insulate Waitt from liability because "[v]eil piercing is an equitable

remedy, and courts are to consider reality and not form in determining a party's

involvement in a corporate enterprise."  Equity Trust Co., 766 N.W.2d at 339

(citation omitted).  "[A] district court may pierce the corporate veil to impose

personal liability against any party who disregards the corporate form,

regardless of whether the party holds an ownership interest in the entity."  <u>Id.</u> at 339-40.  The SAC asserts that Waitt acted as the alter ego of the Lakeland Entities, which were an instrumentality and façade for his individual dealings.  (SAC ¶ 381.)  It alleges that he controlled Lakeland, was personally involved in its ownership and operation, benefitted from disregarding the Lakeland Entities' corporate form, used it to commit fraud, and siphoned money out of Lakeland for his own benefit.  (<u>See, e.g.</u>, <u>id.</u> ¶¶ 57, 63-64, 140, 380-82, 386.)  There is no requirement that Waitt have any – let alone, direct – ownership in Lakeland to support imposing alter ego liability.  Therefore, it is irrelevant that the SAC failed to allege facts to support piercing Avalon's corporate veil.

### G.    Counts Nine and Ten: Unjust Enrichment

"To establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled and that the circumstances are such that it would be unjust for that person to retain the benefit."  <u>Mon–Ray, Inc. v. Granite Re, Inc.</u>, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004) (citations omitted).

The Court holds that the SAC states claims for unjust enrichment against both Defendants.  As it did in the September 30 Order, the Court rejects Avalon's argument that, based on this Court's ruling in <u>Bartholomew v. Avalon Capital</u>

Group, Inc., only the Receiver has the authority to bring this claim because

BMO's claims are common to all Lakeland creditors.  See Bank of Montreal, 743

F. Supp. 2d at 1033.  Moreover, allegations made by Lakeland's Receiver in the

motion to intervene have since been withdrawn in light of the stipulation entered

into between the Receiver and BMO, providing that BMO's unjust enrichment

claims against BMO are unique to BMO and are not subject to the Receiver's

authority.  (See [Docket No. 90] Stipulation ¶ 5.)  The Receiver has also agreed to

abandon any claims to BMO to the extent that the Receiver or Lakeland may

have an interest in BMO's claims.  (Id.; Rasmussen Decl., Ex. 4, Abandonment

Order ¶¶ 2-3.)  Finally, the settlement in the Bartholomew action did not impact

BMO's unjust enrichment claim.  (See id.)

　　　　The Court holds that Defendants' assertion that BMO's request for a

constructive trust fails because the money was commingled with other money is

more appropriately addressed at summary judgment or trial.  At this stage in the

litigation, the Court cannot make a factual finding regarding whether or not the

funds were comingled.  Similarly, it would be inappropriate, at this stage, for the

Court to make a finding regarding whether Waitt personally benefited from

BMO's actions.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.    Defendant Theodore W. Waitt's Motion to Dismiss the Second
      Amended Complaint [Docket No. 110] is **GRANTED** in part
      and **DENIED** in part as follows:

      a.  Counts One through Four are **DISMISSED**.  If BMO fails
          to amend its complaint, within 30 days from the date of
          this Order, to plead conveyance of the alleged
          misrepresentations in the Waitt telephone call to BMO, the
          dismissal of Counts One through Four shall be **WITH
          PREJUDICE**.

      b.  Counts Five through Ten **REMAIN**.

2.    Defendant Avalon Capital Group, Inc.'s Motion to Dismiss the
      Second Amended Complaint [Docket No. 113] is **GRANTED**
      in part and **DENIED** in part as follows:

      a.  Counts One through Four are **DISMISSED**.  If BMO fails
          to amend its complaint, within 30 days from the date of
          this Order, to plead conveyance of the alleged
          misrepresentations in the Waitt telephone call to BMO, the
          dismissal of Counts One through Four shall be **WITH
          PREJUDICE**.

      b.  Counts Five through Ten **REMAIN**.

Dated:  April 3, 2012              s/ Michael J. Davis
                                   Michael J. Davis
                                   Chief Judge
                                   United States District Court